IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned On Briefs April 11, 2001

**STATE OF TENNESSEE v. KELVIN WILSON**

**Direct Appeal from the Circuit Court for Fayette County**
**No. 4480      Jon Kerry Blackwood, Judge**

_____

**No. W2000-02704-CCA-R3-PC  - Filed June 27, 2001**

_____

The Petitioner was convicted of aggravated kidnapping and sentenced to ten years incarceration. Following direct appeal to this Court, which affirmed the Petitioner's conviction and sentence, and to the Tennessee Supreme Court, which denied permission to appeal, the Petitioner filed a petition for post-conviction relief, alleging that he received ineffective assistance of counsel at trial.  The post-conviction court conducted a hearing and denied relief.  The Petitioner now appeals the post-conviction court's decision.   Having reviewed the record, we conclude that the Petitioner's representation at trial was adequate and therefore affirm the post-conviction court's denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

Richard G. Rosser, Somerville, Tennessee, for the Appellant, Kelvin Wilson.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Colin A. Campbell, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The Petitioner, Kelvin Wilson, was convicted by a Fayette County jury of aggravated kidnapping and sentenced to ten years incarceration.  On direct appeal, this Court affirmed his conviction and sentence, and the Tennessee Supreme Court subsequently denied permission to appeal. See State v. Kelvin Andre Wilson, No. 02C01-9802-CC-00052, 1998 Tenn. Crim. App. LEXIS 1163, at *1 (Tenn. Crim. App. Nov. 12, 1998). In December 1999, the Petitioner filed a pro se petition for post-conviction relief. On March 17, 2000, the trial court conducted a post-conviction hearing and denied post-conviction relief.  The Petitioner now appeals the trial court's decision,

arguing that he received ineffective assistance of counsel at trial. We conclude that the Petitioner received effective representation at trial and therefore affirm the judgment of the trial court.

The facts underlying the Petitioner's conviction were summarized on direct appeal as follows:

At trial, the proof developed the following facts. On March 21, 1997, the [Petitioner], a juvenile, was incarcerated at the Wilder Youth Development Center, a state facility for delinquent youth, which is located in Somerville. Christine Johnson, a forty-two year old youth service officer at Wilder, was supervising the recreation of the Programmatic Segregation Unit (PSU), which the officer described as the "overly aggressive, assaultive type students." A total of eight juveniles were outside at the basketball courts including the [Petitioner], who was seventeen years old, and his two co-defendants, Quincy Bledsoe and Fredrequos Demon Neal, both sixteen years old.

Because the [Petitioner] began "horseplaying" with another juvenile, Ms. Johnson ceased the juveniles' recreation time and ordered them to prepare to return indoors. The [Petitioner] encountered Ms. Johnson stating, "We're straight." Ms. Johnson replied, "No, we're going in because you know horseplaying is not allowed." The [Petitioner] then grabbed Ms. Johnson around her neck and began choking her.

In an effort to call for help, Ms. Johnson attempted to "key" her radio, however, someone had taken the radio as well as her keys. At this point, Ms. Johnson believed she would die; therefore, she feigned unconsciousness and fell to the ground. Next, the [Petitioner] and Charles Lusk attempted to handcuff the victim. She pleaded with Bledsoe not to kill her, and Bledsoe told her, "just lay down and let them handcuff you." After handcuffing Ms. Johnson, one of the co-defendants groped the victim's buttocks. The [Petitioner ] and his co-defendants placed a sock in the victim's mouth to gag her. Then, the group tied her feet with strips of cloth from pillow cases, unlocked the storage room door with her keys, and placed her inside.

While confined, Ms. Johnson overheard the juveniles plotting their escape plans to elude Mr. Hayes, another officer at Wilder stationed at the observation booth. Eventually, Mr. Hayes noticed two other juveniles, uninvolved in these charges, quickly peering inside the door which alerted him to the fact that something was wrong. Upon finding Ms. Johnson's keys and radio, Officer Hayes radioed for backup. Hayes, then proceeded to secure the remaining juveniles in their quarters. Thereafter, Hayes found Ms. Johnson locked in the storage room "handcuffed, legs tied, gagged, and . . . trembling."

At trial, Ms. Johnson testified that the handcuffs were extremely tight upon her wrists requiring the assistance of two officers to remove them. She testified that

she experienced numbness in her hands for one month following the incident. She further testified that she sustained temporary injuries to her wrists from the handcuffs, to her neck from the choking which temporarily damaged her voice, and cuts to the corners of her mouth from the gag. The record reflects that Ms. Johnson missed several months of work in order to physically and mentally recuperate from the effects of this incident.

The defense presented one witness, Charles Tate, an eighteen year old who was housed at Wider [sic] at the time of the offense. Tate testified that he and the [Petitioner] had discussed escaping from Wilder one week before this incident. Tate stated that the [Petitioner] was the leader in the plot to escape and initiated the plan by choking Ms. Johnson. Tate revealed that Charles Lusk had torn the pillow case into strips and hid them in his pants before going outside for recreation. Through Tate's testimony, he revealed that the [Petitioner] and Lusk successfully "got under the fence;" however, the [Petitioner] was unable to penetrate the second fence because the fence was affixed to concrete.

See id. at *2-3.

At the post-conviction hearing, the Petitioner testified that he had been imprisoned since December 28, 1998 for the offense of aggravated kidnapping and that he was seventeen years old when he became incarcerated. The Petitioner claimed that his attorney spoke with him only once before trial and failed to inform him of the penalties for the charges against him. He stated that his attorney also failed to discuss with him his right to call witnesses on his behalf.

The Defendant claimed that he told his trial attorney that he attempted to escape the Wilder Youth Development Center primarily because he feared injury or death at the hands of Wilder employees. He claimed that while he was being loaded onto a vehicle to transport him from Wilder to Alabama after his stay at Wilder was terminated, an employee of Wilder threatened him. The Petitioner stated that when he told his attorney this information, his attorney "said that it was irrelevant because it happened after the incident" and chose not to present the evidence to the jury. The Petitioner also reported that one of the officers who transported him to Alabama was willing to testify about the threat, but his attorney did not call the officer as a witness.

The Petitioner also complained that his attorney failed to present as evidence at trial his extensive mental health history. He testified that he was diagnosed with attention deficit disorder as a child and reported that he had been prescribed medication for the disorder. He also testified that he had been diagnosed as severely depressed and had taken medication for his depression. The Petitioner stated that he had been hospitalized approximately five or six times times for these and other disorders. He recalled that his shortest hospitalization lasted six months and that his longest hospitalization lasted two and a half years. The Petitioner testified that he had been a patient at Saint Joseph Hospital, Western Mental Health Institute, Charter Lakeside Hospital, Shelby Training Center, and Memphis Mental Health Institute. The Petitioner stated that he had attempted suicide several times and had once tried to set his room on fire at one institution. In addition, the Petitioner

stated that he was on "suicide watch" two days prior to the incident leading to his conviction. He testified that although he shared this information with his trial attorney, his attorney failed to present evidence concerning his mental health history at trial or at the sentencing hearing. The Petitioner maintained that his attorney should have pursued an insanity or diminished capacity defense. He further testified that his attorney did not inform him that his mental illness could be presented as a mitigating factor at the sentencing hearing. Additionally, he complained that his attorney failed to submit other applicable mitigating factors at the sentencing hearing, including that he was acting under duress at the time of the crime and that the victim was left alive.

The Petitioner testified that he and his attorney discussed whether he should testify at trial. He maintained that he wished to testify at his trial. The Petitioner recalled, "[My attorney] told me that if I testified, it wouldn't do no good . . . . [H]e say let him do it his way. And I did that. I thought that was best." Nevertheless, the Petitioner maintained at the post-conviction hearing that he wished to testify at his trial. Upon further questioning, however, the Petitioner admitted that based on advice from his attorney, he decided not to take the stand.

The Petitioner complained that his attorney failed to file a motion requesting a severance of his trial from that of his co-defendants. The Petitioner testified that during the trial, the confession of one of his co-defendants, implicating the Petitioner in the crime, was read to the jury without objection by his trial attorney. The Petitioner also claimed that his attorney did not object to the make-up of the grand jury that indicted him and did not object to two minority members of the jury being excused from the jury during voir dire. In addition, he complained that his attorney did not object to an inappropriate jury instruction defining reasonable doubt.

The Petitioner further testified that after his stay at the Wilder Youth Development Center, he was transported to and held in Alabama for approximately two and a half months without being charged with any crime. He also claimed that while he was in Alabama, an investigator tried to speak with him, and he requested a lawyer. According to the Petitioner, the investigator continued to question him despite the request. The Petitioner testified that he told his trial attorney about the questioning. However, when asked if his attorney had filed a motion to suppress any statements he had made to the investigator, the Petitioner stated, "I didn't speak with [the investigator]."

Finally, the Petitioner complained that his attorney failed to interview Charles Tate, an inmate at Wilder at the time of the crime. However, the Petitioner also admitted that Tate was called as a witness for the defense at trial. The Petitioner stated that Tate testified against him rather than for him.

The Petitioner's trial attorney responded to the Petitioner's allegations at the post-conviction hearing. He stated that he had been an assistant public defender for three years and had practiced law for a total of ten years. The attorney reported that he was appointed to the Petitioner's case when another member of his office took maternity leave. He recalled meeting with the Petitioner at least two times prior to trial, but stated, "I'm quite sure I saw him more than that."

-4-

The attorney did not recall the Petitioner ever indicating to him that he feared for his life before the crime. He testified, "I recall him saying that after the incident happened, threats were being made by some of the guards to him. And I don't recall him saying that that was the reason he attempted to escape." The attorney reported that he told the Petitioner that he did not believe the threats were relevant because they were made after the incident occurred. He stated, "And without me having any knowledge of threats being made beforehand, . . . I had no basis to assert that as a defense."

With regard to the Petitioner's mental health history, the attorney testified that he requested a mental evaluation of the Petitioner prior to trial. He stated that he obtained the Petitioner's records from several places and submitted them to J.B. Summons Mental Health for an evaluation. The Petitioner was found competent to stand trial. The attorney stated that when one of his clients is evaluated and declared competent for trial, it is his practice to notify the court and request a second evaluation if he becomes aware of any problems with the client after the evaluation. However, he did not request a second evaluation in this case. The attorney stated that based on his interactions with his client, he concluded that the Petitioner was competent. He recalled that the Petitioner appeared to understand their conversations and seemed to understand what he was doing at the time of the crime. Based on his interactions with the Petitioner and the evaluation from J.B. Summons Mental Health, the attorney decided not to pursue an insanity or diminished capacity defense. However, the attorney stated that he could not recall whether he researched the defense of diminished capacity at the time of the Petitioner's trial.

The attorney further testified that he did not file a list of mitigating factors for use in sentencing, choosing instead to argue the mitigating factors at the sentencing hearing. He recalled that he argued that the court should consider the Petitioner's youth as a mitigating factor. He stated that he did not argue that the Petitioner was under duress at the time of the crime because he understood that threats were made to the Petitioner only after the crime occurred. He also stated that he did not present as a mitigating factor the fact that the victim was left alive because the case was not a murder case and he felt there would be no misunderstanding with the court about whether the victim had been left alive. In addition, the attorney testified that he presented lengthy testimony by the Petitioner's mother at the sentencing hearing concerning the Petitioner's mental health history.

The attorney testified that he could not specifically recall any conversations he had had with the Petitioner regarding the Petitioner's right to testify at trial. However, he stated that his policy with all clients was to advise them regarding their right to testify and then act on their decisions. He stated that despite the Petitioner's age, the Petitioner seemed to fully understand his advice, and he believed the Petitioner was capable of making his own decisions.

The attorney stated that he and the Petitioner discussed severing the Petitioner's trial from that of his co-defendants. However, the attorney recalled that he told the Petitioner that if the trials were severed, "the State at that point would be in a position to possibly work out an agreement with one of the co-defendants who could testify against him at trial." The attorney stated that he believed it was unlikely that either of the co-defendants would testify at a consolidated trial and therefore that

if the cases remained consolidated, neither of the co-defendants could implicate the Petitioner in the crime. The attorney stated that for these reasons, he advised his client that it was in his best interest not to sever the trials.

The Petitioner's attorney stated that he and the Petitioner did not discuss the make-up of the grand jury, but he stated that they may have discussed the make-up of the jury. He reported that he objected to the exclusion of two minority members from the jury by the State, but he stated that his objection was overruled. The attorney testified that he could not recall anything about a jury instruction defining reasonable doubt. However, he also testified that he had heard jury instructions on reasonable doubt on other occasions from the judge presiding over the Petitioner's trial, and he maintained that he had never found the instructions to be objectionable.

With regard to the Petitioner's incarceration in Alabama prior to his indictment in this case, the attorney stated, "I didn't think that he was being prejudiced. He was already in Wilder, which is a penal facility for juveniles. So it wasn't like his liberty was at a loss in Alabama."

The attorney refuted the Petitioner's claim that he failed to interview witness Charles Tate before trial, stating that he interviewed Tate at the transfer hearing. He also explained that he called Tate as a witness to show that "the purpose of [the Petitioner] being involved in this act . . . was merely to escape as opposed to cause any harm to the guard."

The Petitioner argues that he should receive post-conviction relief because he received ineffective assistance of counsel at trial. In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203. The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id. § 40-30-210(f). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001) (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). A post-conviction court's conclusions of law, such as whether counsel's performance was deficient or whether that deficiency was prejudicial, are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at *457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective

assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

In its written order denying post-conviction relief, the post-conviction court made the following findings:

Although the petitioner alleges numerous instances in which he insists counsel failed to provide effective assistance of counsel, the most serious allegations relate to counsel's failure to rely on either a defense or insanity or diminished capacity; utilize the defendant's mental condition as a mitigating factor; and the issue concerning the defendant's failure to testify.

The petitioner presented as exhibits voluminous records of mental health commitments in the past. Included in the mental health records were instances of attempted suicide. The petitioner asserts that counsel failed to give notice and rely upon insanity or diminished capacity as a defense. Also included in the record is a document from J.B. Summers Counseling Center. Pursuant to an order by the trial Court the petitioner was examined to determine his competency and sanity at the time of the offense. The report indicates that the petitioner was both competent and sane. [The Petitioner's trial attorney] further testified that at all of his meetings with the petitioner, he did not detect any hint of the petitioner's inability to understand the charges against him, the nature of the proceedings, or to communicate or cooperate with him in the preparation of his defense. Lastly, there is nothing in the mental health records to indicate a possible defense of insanity or diminished capacity. Most of the mental health records reveal attention deficit disorder or behavioral problems. Furthermore, there is no showing at this hearing that a defense of insanity or competency could have been sustained at a trial of this matter.

The petitioner complains that [his attorney] did not make the court aware of the mental health records as a mitigating factor as sentencing. However, the petitioner's mother testified at the sentencing hearing. She presented the petitioner's mental health problems for the Court's consideration. Therefore, the Court was aware of the significant mental health situation of the petitioner.

The petitioner vaguely asserts that [his attorney] prevented him from taking the witness stand to testify. [The attorney] testified that he had no recollection of any conversation with the petitioner regarding this issue. However, [the attorney] testified that it was his policy to allow his clients to make that decision. [The attorney] was certain that it was the petitioner's choice not to testify. Furthermore, the petitioner made no showing as to what his testimony would be at trial, or how it would have changed the outcome of the trial.

Numerous other incidental allegations of ineffectiveness were made by the petitioner. Challenges to the racial composition of the Grand Jury, the petitioner's transfer to other institutions after a juvenile transfer hearing, improper executive delegation of legislation, failure to make objections to the District Attorney General's arguments, and various other procedural technicalities were complained of. None of the allegations could have changed the outcome of this trial.

We conclude that the evidence does not preponderate against these findings by the trial court. There is no evidence in the record that the Petitioner was unable to appreciate the nature or wrongfulness of his acts at the time he committed the offense in this case. See Tenn. Code Ann. § 39-11-501. Nor did the Petitioner present expert testimony aimed at negating the requisite culpable mental state for the crime charged. See State v. Hall, 958 S.W.2d 679, 688 (Tenn. 1997). Thus, as the post-conviction court noted, "[t]here is nothing in the trial nor the post-conviction record to indicate either a defense of insanity or competence could have been supported in this matter." We are also unconvinced that the Petitioner was prevented from taking the stand at trial. Finally, we conclude that the record supports the post-conviction court's conclusion that the trial court was aware of the Petitioner's mental health history when sentencing him for this crime. Although a transcript of the sentencing hearing is not included in the record,[1] the Petitioner's trial attorney testified at the post-conviction hearing that he presented testimony at the sentencing hearing by the Petitioner's mother concerning the Petitioner's extensive mental health history. Having reviewed the record, we are satisfied that the Petitioner's representation at trial was well within the range of competence demanded of attorneys in criminal cases. See Baxter, 523 S.W.2d at 936.

Accordingly, we AFFIRM the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

---

[1] It is the appellant's duty to prepare an adequate record on appeal. Tenn. R. App. P. 24(b).